UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| JODY JONES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 15-050-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| PERRY COUNTY FISCAL COURT, | ) | **MEMORANDUM OPINION** |
| et al., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of several motions, including the defendants' motion for summary judgment.  [Record No. 40]  Sovereign immunity protects Defendant Perry County Fiscal Court ("PCFC") from Plaintiff Jody Jones' state law claims, and Jones has not presented sufficient proof to maintain his federal constitutional claims against PCFC.  Therefore, PCFC is entitled to summary judgment on all claims.  The defendants' motion will also be granted regarding the plaintiff's official capacity claims against Defendant Judge Scott Alexander, Perry County's Judge Executive.  In his individual capacity, Judge Alexander is also entitled to summary judgment regarding all of Jones' state law claims and with respect to Jones' federal claim based on an alleged violation of the plaintff's rights protected by the Fourteenth Amendment.  However, summary judgment is not appropriate regarding Jones' First Amendment claim against Judge Alexander in his individual capacity.

- 1 -

The plaintiff has also submitted motions requesting an evidentiary hearing and permission to file a sur-reply.  [Record Nos. 49; 50]  Because neither an evidentiary hearing nor a sur-reply are necessary, those motions will be denied.

## I.

Many of the relevant facts are undisputed.  On October 24, 2012, Plaintiff Jody Jones began working as a maintenance employee for the Perry County Fiscal Court. [Record Nos. 40-1, p. 1; 45, p. 2]  Jones was hired by his uncle, Denny Ray Noble.  At the time of Jones' hiring, Noble held the office of Perry County's Judge Executive. [Record Nos. 40-1, p. 1; 45, p. 3]  At its meeting on November 20, 2012, PCFC retroactively approved the decision to hire Jones with the intention that he would replace Darrell Fugate, the maintenance supervisor who was planning to retire.  [Record No. 40-2, p. 5]  Sometime after Jones was hired and Fugate retired, Eric Harkins was also hired as a maintenance employee.  [Record Nos. 40-1, p. 6; 45, p. 3]

In 2014, while Noble was running for re-election, several PCFC employees, including Jones and Harkins, actively campaigned on Noble's behalf.  [Record Nos. 40-1, pp. 2, 7; 45, p. 3; 33, pp. 41-42]  On at least one occasion, Alexander, who was running against Noble, saw Harkins, Jones, and other PCFC employees with Noble while they were campaigning.  [Record Nos. 33, pp. 41-42; 34, pp. 8-9]

In May of 2014, Alexander defeated Noble in the primary election.  [Record Nos. 40-1, p. 1; 45, p. 3]  Alexander then went on to win the general election.  On January 5, 2015, he assumed the office of Perry County Judge Executive.  [Record Nos. 40-1, pp. 1-2; 45, p. 1]  On the afternoon of January 6, 2015, on his second day as county judge

- 2 -

executive, Alexander called Jones into his office and told him that he was being terminated.  [Record Nos. 40-1, p. 2; 45, pp. 7-8]  Jones and Alexander agree that Jones then asked if he was being fired "because of Denny Ray."  [Record Nos. 33, p. 34; 34, p. 34]  Jones testified during his deposition that Alexander silently mouthed the words, "You are right."  [Record No. 33, p. 34]  Alexander denies this and testified that he only responded, "All I'm saying is you are terminated."  [Record No. 34, pp. 34-35]  After he left work, Jones claims that he called Alexander and told him that he needed a termination letter.  [Record No. 33, p. 35]  According to Jones, Alexander responded that "he had to get with John Carl [Perry County's attorney] in the morning to see why he fired me."  *Id.*

The parties agree that, the next day, Jones received a one-sentence letter that simply stated, "Your employment with the Perry County Fiscal Court will be officially terminated on Wednesday, January 7, 2014 [sic]."  [Record Nos. 1-1, pp. 4-5; 40-1, p. 2]  The parties also agree that Jones was not fired because of poor job performance or discipline issues.  [Record Nos. 34, pp. 12-13; 44, p. 5]  While Alexander knew that Jones was related to Noble, he contends that he did not fire Jones based on his connection to the former judge executive.  [Record No. 34, pp. 10, 19]  Instead, Alexander maintains that he fired Jones because Jones and Harkins were performing the same job, and budget constraints required that he terminate one of them.  *Id.* at 18-19.  According to Alexander, he observed Harkins and Jones changing lightbulbs together and going to pick up the mail as a team.  *Id.* at 20-21, 32.  Alexander admits that he had no reason for terminating Jones over Harkins.  *Id.* at 43.

The defendants claim that PCFC approved Alexander's decision to terminate Jones' position at its meeting on January 22, 2015. [Record No. 40-1, pp. 10-11] The minutes from that meeting merely show that PCFC approved the decision to hire a list of PCFC employees. [Record No. 40-4] Jones' name is not on the list. *Id.*

On March 10, 2015, Jones filed this action in Perry Circuit Court against PCFC and Alexander, in his official and his individual capacities. [Record No. 1-1] Jones asserts three state law claims and two based on 42 U.S.C. § 1983. *Id.* In Count I, Jones claims that he is entitled to damages for political discrimination arising from the defendants' violation of Ky. Rev. Stat. § 67.710(7). *Id.* at 6-7. In Count II, Jones requests declaratory and injunctive relief for the defendants' violation of sections 2 and 3 of the Kentucky Constitution. *Id.* at 7. Specifically, Jones seeks "to be reinstated to his former position with full back pay and benefits, and to have his termination declared null and void." *Id.* Jones also requests punitive damages and attorneys' fees under Count III for "State Law Wrongful Discharge." *Id.* at 7-8. Jones has also asserted federal constitutional claims based on 42 U.S.C. § 1983. In Count IV, Jones claims that the defendants violated his procedural due process rights under the Fourteenth Amendment by failing to give him proper notice and a hearing. *Id.* at 8-9. In Count V, Jones seeks damages for the defendants' alleged violation of his First Amendment rights to freedom of speech and freedom of association. *Id.* at 9.

On March 20, 2015, the defendants removed the case to this Court under 28 U.S.C. § 1331. [Record No. 1] The defendants have now moved for summary judgment on all of the plaintiff's claims. [Record No. 40] They contend that they are entitled to

immunity on all claims, but also argue that summary judgment is appropriate for each claim on the merits.  *Id.*

## II.

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  *See Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).  In deciding whether to grant a motion for summary judgment, the Court must view all the facts and draw all inferences from the evidence in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

PCFC argues that sovereign immunity protects it from liability for all of the plaintiff's state law claims.  [Record No. 40-1, p. 20]  PCFC also contends that Jones has not shown sufficient proof to maintain his § 1983 claims against it.  *Id.* at 18-19.

Alexander contends that he is entitled to qualified immunity for all of the plaintiff's claims against him in his individual capacity.  *Id.* at 13-15.  Regarding Jones' state law claims against Alexander in his official capacity, Alexander contends that he is protected by the same sovereign immunity applicable to PCFC.  *Id.* at 20.  Finally, Alexander argues that the § 1983 claims asserted against him in his official capacity are

duplicative of Jones' § 1983 claims against PCFC.  *Id.* at 17-18.  As outlined below, Alexander and PCFC are entitled to immunity on some, but not all, of Jones' claims.

### A.    Federal Claims based on 42 U.S.C. § 1983

State governments are not subject to liability under § 1983.  *Howlett ex rel. Howlett v. Rose*, 496 U.S. 356, 376 (1990).  However, the Supreme Court has construed the word "person" in § 1983 to include municipal corporations and other similar governmental entities.  *Id.*  Accordingly, PCFC and its employees are potentially liable under the statute.  Nevertheless, liability under § 1983 is limited.  Qualified immunity is still available under certain circumstances for government employees sued in their individual capacities.  *See Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 339 (6th Cir. 1990).  And governmental entities are not subject to vicarious liability under § 1983 for the actions of their employees.  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978).

### 1.    Qualified Immunity for Judge Alexander

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once the defense is raised, the burden is on the plaintiff to prove that the official is not entitled to immunity.  *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010).  Thus, viewing all the facts in a light most favorable to Jones, the Court must determine whether Jones has alleged sufficient facts showing that Alexander violated his clearly-established constitutional rights.  *See id.*  Because Jones has not shown that he was

entitled to any procedural due process under the Fourteenth Amendment, Alexander is entitled to qualified immunity regarding the claim asserted in Count IV.  However, Jones has alleged sufficient facts to maintain his First Amendment claim against Alexander.

### a.        Fourteenth Amendment Claim

Jones claims "he was not given an opportunity for a due process hearing prior to the termination of his employment, nor was [he] given any reason for the termination of his employment." [Record No. 1-1, p. 8]  Based on this alleged deprivation of notice and a hearing, Jones claims that Alexander violated his Fourteenth Amendment right to procedural due process.  *Id.*

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).  A government position, by itself, does not constitute a protected property interest.  *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997).  "Government employment amounts to a protected property interest if the employee is 'entitled' to continued employment."  *Id.*  (citing *Roth*, 408 U.S. at 577). Whether a property interests exists primarily depends on state law.  *Id.*  Therefore, a government employee asserting a protected property interest in his position must "point to some statutory or contractual right conferred by the state which supports a legitimate claim to continued employment."  *Id.*

An at-will employee, or an employee who may be terminated without cause, does not have a protected property interest.  *Id.*  In Kentucky, an employee is at-will "unless

the parties specifically manifest their intention to condition termination only according to express terms . . . ." *Id.* (citing *Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 491 (Ky. 1983)).   Jones primarily relies on Perry County's "Personnel Policies and Procedures" handbook ("policies and procedures") to support his contention that his maintenance job amounts to a protected property interest.   [Record No. 45, p. 34]   In Kentucky, an employer's policies and procedures may establish whether he has an at-will or for-cause relationship with his employer.   *Bailey*, 106 F.3d at 141 (citing *Shah*, 655 S.W.2d at 492).

In the present case, Perry County's policies and procedures establish a classification system for Perry County employees.   [Record No. 40-3, p. 13]   Under this system, an employee is classified as introductory, full-time, part-time, or temporary.   *Id.* Jones contends that he was a full-time employee, and the defendants have not challenged his position.   [Record No. 45, p. 34]   Regarding full-time employees, the policies and procedures state, "[a]fter successful completion of an introductory period, full-time Appointments are made on a full-time basis, to full-time established positions, for an Indefinite period."   [Record No. 40-3, p. 13]   According to Jones, this provision establishes his ongoing right to employment.   [Record No. 45, p. 34]

However, Jones' argument is flawed in two respects.   First, Kentucky courts have expressly held that employment for an indefinite period is at-will employment.   *See Shah*, 655 S.W.2d at 491 ("*Edwards* [*v. Ky. Utils. Co.*, 150 S.W.2d 916 (Ky. 1941)] is one of many cases in this jurisdiction holding that employment for an indefinite period of time

- 8 -

may be terminated by either party at will.").   Second, Perry County's policies and procedures specifically provide:

> This classification of employees by the county is merely intended to provide a basic delineation between the types of employment available with the county.   It is expressly noted that nothing in the semantical classification of employees is intended to create a contract of employment. Any individual may voluntarily leave employment or be terminated at any time, for any lawful reason or no reason at all.

[Record No. 40-3, p. 16]   Moreover, on the following page entitled, "Conditions of Employment," the policies and procedures contain the following disclaimer:

> Nothing contained in the county's personnel policies, including the successful completion of an initial or promotional introductory period, shall alter the "at-will" employment status between the county and the employee. The employee or the county may terminate the employment relationship during or after the initial or promotional introductory period for any lawful reason, or for no reason at all.

*Id.* at 17.

Contrary to Jones' assertions, the policies and procedures do not establish that his status as a full-time employee entitled him to continued employment.   In fact, the county's policies and procedures establish just the opposite.   According to the policies and procedures, full-time employees are at-will employees.   The policies and procedures' express disclaimers defeat the plaintiff's claim that he possessed a protected property interest in his continued employment with PCFC.   *See Shelton v. Brown*, 71 F. Supp. 2d 708, 712-713 (W.D. Ky. 1998) (Where the defendant city's policies and procedures manual contained an express disclaimer that the manual was "not intended to represent a contract between any employee and the city," the plaintiff's employment was at-will even though the manual also provided for a pre-disciplinary hearing.); *Myers v. Dean*, No.

- 9 -

2:04 CV 00654, 2006 WL 689086, at \*5 (S. D. Ohio Mar. 16, 2006) (The plaintiff did not have a protected property interest where the employee handbook contained "an express disclaimer that it is 'not an employment contract, express or implied,'" and repeatedly stated that it was not intended to limit the employer's right to terminate his employee.).

Jones relies on *Francis v. Marshall*, No. 07-240-ART, 2010 WL 4053572 (E.D. Ky. Oct. 14, 2010), to support his contention that indefinite employment constitutes a for-cause, instead of an at-will, employment relationship.   [Record No. 45, pp. 33-34] Similar to the assertions here, Francis claimed that the county judge executive fired him at the beginning of the judge executive's term because of political bias.   *Francis*, 2010 WL 4053572, at \*2.   The judge executive countered that Francis was fired because his job was unnecessary and should not be refunded.   *Id.* at \*1.   Because Francis held his job pursuant to a resolution of the fiscal court, the Court held that "the terms of that resolution are the most important indicator of whether Francis had a property interest in his job."   *Id.* at \*4.

The terms of the resolution indicated that Francis was "appointed to serve for an indefinite period of time, *but not to exceed a four year period*."   *Id.*   The judge executive terminated Francis' employment on the day that the four-year period ended.   *Id.*   Thus, the Court concluded, "[a]t most, the resolution entitled Francis to continue his employment until December 31, 2006.   But it provided absolutely no entitlement to employment beyond that date."   *Id.*   Based on those two sentences, Jones argues that the court would have found that Francis was entitled to continued employment if the resolution had merely stated that he was appointed to serve for an indefinite period

without the four-year term limitation.  Not only was this issue not a question before the *Francis* court, but Kentucky jurisprudence holds otherwise.  As discussed earlier, appointment for an indefinite term constitutes at-will employment in Kentucky.  *See Shah*, 655 S.W.2d at 491.

Notwithstanding Perry County's policies and procedures, the plaintiff argues that he is entitled to continued employment because the county's existing practices "form the basis of a common law or de facto tenure system." [Record No. 45, p. 34]  In the absence of an explicit contractual provision, a person may still demonstrate a right to continued government employment if he or she can establish that the employer's practices constituted a de facto or common law tenure system.  *Perry v. Sinderman*, 408 U.S. 593, 601-02 (1972).

For his de facto tenure argument, the plaintiff relies on the fact that he and other employees maintained their positions at PCFC for a substantial period of time.  [Record No. 45, p. 34]  Jones observes that he had personally been employed by PCFC for over two years, and several employees remained employed year after year.  *Id.*  The plaintiff in *Francis*, 2010 WL 4053572, at *5, made a similar argument, relying on the fact that he and other employees had been re-hired by the county in the past.   However, the Court concluded that such evidence was insufficient to establish a de facto tenure system.  *Id.* Likewise, the fact that Jones and his co-workers were able to maintain their positions for a number of years did not transform their positions from at-will to for-cause status. Accordingly, Jones did not have an express or an implied entitlement to continued employment as PCFC's maintenance man.  Because Jones was not entitled to procedural

due process rights under the Fourteenth Amendment, Alexander did not violate the Fourteenth Amendment by terminating him without a hearing or more notice. Therefore, Alexander is protected by qualified immunity, and his motion for summary judgment on this claim will be granted.

### b.    First Amendment Claim

Jones also contends that Alexander violated the First Amendment by terminating him based on his "political affiliation with the prior county judge executive, his uncle." [Record No. 45, p. 36]  Alexander argues that Jones cannot link his termination to his political speech because other PCFC employees who campaigned for Noble were not terminated. [Record No. 40-1, p. 13]  Further, he contends that Jones' right to associate with his uncle is not clearly established. [Record Nos. 40-1, p. 13; 46, p. 11]

"[T]he first Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless political affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party*, 497 U.S. 62, 64 (1990).  Alexander does not argue that Jones' maintenance position falls into the category of positions where political affiliation is a permissible basis for termination. Likewise, he does not dispute that campaigning for Noble constituted protected political speech. Instead, Alexander claims that Jones has not presented sufficient proof connecting his political speech to Alexander's decision to terminate Jones. [Record No. 40-1, p. 13]

To maintain his First Amendment claim, Jones "must point to specific, nonconclusory allegations linking [his] speech to employer discipline." *Bailey*, 106 F.3d

at 144 (internal quotation marks omitted).  Proof that "an adverse employment action followed speech that the employer would have liked to prevent" is not sufficient to defeat a motion for summary judgment.  *Id.* at 144-145.  Rather, Jones "must present evidence sufficient to create a genuine issue that [his] speech *caused* [his] discharge."  *Id.* at 145. Viewing all the evidence in a light most favorable to the plaintiff, Jones has presented sufficient evidence such that a reasonable jury could conclude that his First Amendment rights were violated by Alexander's decision to fire him.  For the purposes of summary judgment, the Court accepts the plaintiff's version of the facts as true.  *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).  According to the plaintiff, when he asked Alexander if he was being fired because of his uncle, Alexander responded affirmatively by mouthing the words, "You are right."  [Record No. 33, p. 34] Jones also testified that when he called Alexander later that night, Alexander told Jones that he would have to talk to Perry County's attorney to determine why he fired Jones, indicating that his actual reason was an illegitimate one.  *Id.* at 35.

Jones has also presented circumstantial evidence that Alexander fired him based on his political affiliation with his uncle.  The defendants do not dispute that Jones had worked for Perry County for longer than Eric Harkins, who remained in his position after Jones was fired.  Jones has also presented evidence that he was more qualified than Harkins.  Jones has a master electrician license, an industrial maintenance degree, and a refrigerant certification.  [Record No. 33, pp. 9, 27].  Harkins and Tonya McQueen, Perry County's treasurer, agreed during their respective depositions that Jones had more experience and was more qualified than Harkins.  [Record Nos. 35, p. 5; 44, pp. 11-12]

Nevertheless, Alexander fired Jones over Harkins. Even Alexander admits that he had no reason for firing Jones instead of Harkins. [Record No. 34, p. 43] By his own admission, Alexander did not consider any of the typical factors – like qualification, education, and experience – that employers weigh when deciding whether a person should be terminated. A reasonable jury might conclude from this evidence that Alexander had another reason for firing the nephew of his political rival so quickly after he assumed office.

Even though Alexander maintains that he fired Jones for budgetary reasons, Jones has offered sufficient evidence rebutting that contention. Harkins testified that on the same day that Jones was fired or the next day at the latest, Alexander told Harkins that he would find someone else to help him. [Record No. 35, pp. 11-12] Harkins also recalled that Alexander told him to purchase any additional tools he needed and to buy two of everything that he would need. *Id.* at 12. In other words, Alexander communicated that Jones would be replaced by another maintenance worker, undermining his claim that he had eliminated Jones' position. Moreover, Tonya McQueen testified that she was never instructed to eliminate Jones' position from the county's budget. [Record No. 44, pp. 28-29] Alexander also fired Jones on his second day in office, giving him little time to observe whether two maintenance positions were actually necessary.

The record indicates that PCFC does in fact need more than one maintenance worker. Not long after Jones was fired, Harkins was injured at work and is not currently able to work for Perry County. [Record No. 35, p. 14] Alexander has replaced him with Shawn Williams along with contractual labor from a company called Reliable Resources.

- 14 -

[Record No. 34, pp. 27-29]  Williams and Reliable Resources' owner, Scott Brashear, supported Alexander during his political campaign.  *Id.*  Tonya McQueen even testified that Williams and the new contractual labor are paid almost twice as much per hour as Jones' hourly rate ($28.00 per hour compared to $15.35 per hour).  [Record Nos. 34, p. 29; 44, p. 13]  Because Harkins and Jones also received benefits from PCFC, the defendants argue that their pay was comparable, if not higher, than the new contractual labor.  [Record No. 46, pp. 5-6]  The defendants have not offered evidence directly comparing the rates of pay though, and regardless, a jury might reasonably conclude from these facts that Alexander did not actually fire Jones because of budgetary concerns.

Alexander counters that he is still entitled to summary judgment on this issue because he has offered evidence that other employees who campaigned for Noble were not fired like Jones.  [Record No. 40-1, p. 13]  Alexander may offer this to the jury as a defense for his actions.  However, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  While the jury might find Alexander's defense convincing, a reasonable jury might also conclude that Alexander fired Jones because he believed Jones was more politically aligned with his uncle than the other employees who also worked on Noble's campaign.

Alexander also argues that the First Amendment does not clearly protect Jones' right to associate with his uncle.  [Record Nos. 40-1, p. 13; 46, pp. 3-4, 11]  However, Jones is not arguing that Alexander fired him merely because of his relationship to his uncle.  Instead, Jones contends that Alexander fired him because of his political

association with his uncle.  According to Jones, Alexander fired him because he was the nephew of Alexander's political rival *and* because he had campaigned for Alexander's rival.

In political patronage cases, courts frequently discuss the First Amendment's free speech and freedom of association protections together.  *See Rutan*, 497 U.S. at 77 ("Patronage hiring places burdens on free speech and association . . . ."); *Blair v. Meade*, 76 F.3d 97, 99 (6th Cir. 1996) (The plaintiffs alleged that their former government employer violated their First and Fourteenth Amendment rights of free speech and association by discharging them for their political affiliations.).  Thus, the undersigned finds that this argument is a red herring, meant to distract from the actual issue: whether Alexander fired Jones for his political affiliation with Noble.

Undoubtedly, this issue is hotly contested by both parties, and both parties have presented proof of their respective positions.  Thus, the question of whether Alexander violated Jones' First Amendment right to free speech is genuinely in dispute, and he is not entitled to qualified immunity on the issue.  Therefore, his motion for summary judgment will be denied regarding this count.

### 2.    Official Capacity Claims against Alexander

Alexander also argues that he is entitled to summary judgment on the plaintiff's constitutional claims asserted against him in his official capacity.  [Record No. 40-1, pp. 17-18]  "In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent."  *Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993).  *See Kentucky v. Graham*, 473 U.S. 159,

166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").  Accordingly, the plaintiff's claims against Alexander and PCFC are redundant.  Because a suit against Alexander in his official capacity is truly a suit against PCFC, the plaintiff's constitutional claims against Alexander in his official capacity will be dismissed as duplicative.  *See C.K. v. Bell Cnty. Bd. of Educ.*, 839 F. Supp. 2d 881, 884 (E.D. Ky. 2012) ("A plaintiff may sue a local government directly for damages . . . so there is no longer a need to bring official-capacity actions against local government officials." (internal quotation marks and citation omitted)).

### 3.     PCFC's Liability

PCFC claims that summary judgment is warranted on the plaintiff's constitutional claims because respondeat superior is not a proper basis for § 1983 liability.  [Record No. 40-1, pp. 18-19]  PCFC is correct that "a municipality cannot be made liable under 42 U.S.C. § 1983 on a *respondeat superior* basis."  *Graham*, 473 U.S. at 168.  In other words, even if Alexander did violate a protected constitutional right, PCFC is not liable simply because Alexander is employed by PCFC.

However, PCFC may be held liable under § 1983 based on "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [its] officers." *Adkins v. Bd. of Educ.*, 982 F.2d 952, 957 (6th Cir. 1993) (quoting *Monell*, 436 U.S. at 690).  Relying on the Supreme Court's plurality decisions in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), and *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), the Sixth Circuit has held that a single act of a local official may establish that his employer adopted an unconstitutional policy if the official has "final policymaking

authority." *Adkins*, 982 F.2d at 957-58. "[W]hether an official has such final authority is a question of state law." *Id.* at 957 (citing *Pembaur*, 475 U.S. at 483).

The plaintiff argues that Alexander was a final policymaker because he fired Jones without PCFC's approval. [Record No. 45, p. 39] Kentucky Revised Statute § 67.710, which sets forth the powers and duties of county judge executives, requires judge executives to obtain the fiscal court's approval for all hiring and firing decisions. Ky. Rev. Stat. § 67.710 ("[The county judge executive's] responsibilities include, but are not limited to, the following: . . . (7) Exercise with the approval of the fiscal court the authority to appoint, supervise, suspend, and remove county personnel (unless otherwise provided by state law) . . . ."). The parties disagree about whether PCFC approved Jones' termination.

The defendants contend that PCFC did approve the termination retroactively on January 22, 2015, several weeks after Jones was fired by Alexander. [Record No. 40-1, pp. 10-11] However, the minutes from PCFC's January 22nd meeting merely demonstrate that the fiscal court approved a list of current employees and their salaries. [Record No. 40-4] Jones' name is not on this list, and there is no indication that PCFC was specifically presented with the fact that Jones had been terminated. *Id.*

But regardless of whether PCFC approved Jones' termination, Alexander did not have final policymaking authority under state law. A final policymaker's decisions are "final and unreviewable." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). Even if Alexander did fire the plaintiff without PCFC's approval, Ky. Rev. Stat. § 67.710(7) clearly gives the fiscal court authority to review his decisions. The plaintiff

has also failed to present proof of an unconstitutional governmental policy established by usage or custom.  *See Adkins*, 982 F.2d at 957 ("A formally adopted policy is not required; established usage or custom may be sufficient.").  The record does not contain any evidence that Alexander or other PCFC officials violated the First Amendment rights of other employees.  As the defendants have observed, other employees who campaigned for Noble were not similarly fired.  Because the plaintiff has not presented any proof showing that PCFC adopted an unconstitutional policy, its motion for summary judgment will be granted as to all of the plaintiff's constitutional claims against it.

### B.    State Law Claims

Alexander and PCFC claim that they are entitled to immunity for all state law claims against them.  [Record No. 40-1]  PCFC is entitled to sovereign immunity on all of the plaintiff's state law claims, and Alexander is protected by the same immunity for the claims against him in his official capacity.  But Alexander is not entitled to qualified immunity for the plaintiff's state law claims against him in his individual capacity.  Nevertheless, summary judgment is still appropriate for those claims because Alexander has shown that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law on each of them.

### 1.    Sovereign Immunity for PCFC

"When assessing whether defendants are entitled to immunity from state law tort liability, the Court must apply Kentucky rules of sovereign immunity."  *Ivey v. McCreary Cnty. Fiscal Court*, 939 F. Supp. 2d 762, 765 (E.D. Ky. 2013).  Under Kentucky law, county governments are protected by sovereign immunity.  *Schwindel v. Meade Cnty.*,

113 S.W.3d 159, 163 (Ky. 2003).  And absent a legislative waiver, county governments cannot be held vicariously liable for the ministerial acts of their employees.  *Id.*

The plaintiff does not argue that Kentucky's General Assembly has waived PCFC's sovereign immunity.  Jones merely asserts that, "[t]here is no sovereign immunity for either Defendant in this case due to the allegations of violations of the federal and state constitutions."  [Record No. 45, p. 38]  However, Jones fails to cite to any legal authority supporting this assertion.  Because PCFC is cloaked with sovereign immunity for Jones' state law tort claims, its motion for summary judgment will be granted regardomg all claims asserted against it.  *See Francis v. Marshall*, 684 F. Supp. 2d 897, 912 (E.D. Ky. 2010) (Common law wrongful discharge claims against a Kentucky county fiscal court were dismissed based on the doctrine of sovereign immunity.).

### 2.    Official Capacity Claims against Alexander

In Kentucky, a county judge executive sued in his or her official capacity "is cloaked with the same immunity as the government or agency he/she represents." *Schwindel*, 113 S.W.3d at 169.  Thus, as an agent of PCFC, Alexander is protected by the same sovereign immunity that protects PCFC, and his request for summary judgment will be granted regarding the plaintiff's state law claims made against him in his official capacity.

### 3.    Qualified Immunity for Alexander

Kentucky's qualified immunity doctrine protects individual officers from liability for their negligent performance of: (i) discretionary acts or functions, (ii) made in good

faith, (iii) within the scope of their authority.  *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).   An act is discretionary if it requires the exercise of judgment or personal deliberation.  *Id.*  Conversely, qualified immunity is not available "for the negligent performance of a ministerial act, *i.e.,* one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *Id.*

Alexander's decision to fire Jones was a discretionary act, meeting the first requirement of Kentucky's qualified immunity test.  Alexander's duties did not require him to dismiss Jones, and the plaintiff does not contend that Alexander was actually performing a ministerial function when he fired Jones.  However, a genuine issue of material fact does exist concerning whether Alexander acted within the scope of his authority, the last requirement of the qualified immunity test.  The Supreme Court of Kentucky has interpreted the scope of authority requirement broadly.  *See Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 487 (Ky. 2006).  An official's action will be considered within the scope of his authority even if it is within "the outer perimeter" of his duties.  *Id.* at 487.  However, an act falls outside that broad perimeter if it is "manifestly or palpably beyond [the official's] authority."  *Id.* at 488.

Kentucky law explicitly requires that Alexander obtain the fiscal court's approval in order to exercise his power to terminate an employee.  *See* Ky. Rev. Stat. § 67.710(7).  In other words, his authority to dismiss employees is contingent on PCFC's approval.  Contrary to the defendants' assertions, nothing in the record indicates that the fiscal court approved Alexander's decision.  The minutes from PCFC's January 22, 2015, meeting do

not show that the subject of Jones' dismissal was even raised at the meeting. [Record No. 40-4]  In fact, during his deposition, Alexander admitted that at the time he fired Jones, he was not aware that PCFC's approval was necessary. [Record No. 34, p. 22]  He also admitted that he "did not receive approval from anybody on the Perry County Fiscal Court with regard to making a termination decision . . . ." *Id.* at 24.

Even if Alexander did not receive approval from PCFC, the defendants observe that Ky. Rev. Stat. § 67.710 "explicitly states that the judge executive's powers and responsibilities 'include, *but are not limited to*' those listed in the statute." [Record No. 46, p. 8]  According to Alexander, "[s]imply because the statute does not specifically list the power to abolish positions as one of a judge executive's authorities does not mean that judge executives are prohibited from doing so." *Id.*  In essence, Alexander asks the Court to ignore subpart 7 of § 67.710, which requires fiscal court approval for terminating employees.  Instead, he suggests that the Court should only give effect to the introductory words of the statute.  To do so would require the Court to ignore the plain meaning of the statute and would render subpart 7 superfluous, contrary to traditional canons of statutory construction recognized by Kentucky courts. *See MPM Fin. Grp. v. Morton*, 289 S.W.3d 193, 198 (Ky. 2009) (Traditional rules of statutory construction counsel against reading statutes so that they are "void of any significant meaning or purpose.").  In short, Alexander has not shown that firing Jones was within the scope of his authority.  Section 67.710 indicates that such authority is manifestly and palpably outside of his authority.  Therefore, he is not entitled to qualified immunity on any of the defendant's state law claims.

### 4.     Political Discrimination Claim

Because Alexander reached beyond the authority granted to him by Ky. Rev. Stat. § 67.710, Jones claims that he is entitled to compensatory damages as well as attorney's fees for political discrimination.  [Record No. 1-1, pp. 6-7]  Notably, § 67.710 only lists the powers and responsibilities of a county judge executive.  The statute does not explicitly authorize suits for political discrimination against judge executives who violate its individual provisions.  In other words, it is not self-executing.

Jones argues that his political discrimination claim is authorized by Ky. Rev. Stat. § 446.070, which provides, "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."  However, the mere violation of a statute, by itself, does not create liability under § 446.070.  *Hargis v. Baize*, 168 S.W.3d 36, 46 (Ky. 2005).  Relief is only available where the statute "is penal in nature and provides no civil remedy . . . ."  *Id.* at 40.  Further, the person damaged by violation of the statute must fall "within the class of persons the statute intended to be protected."  *Id.*  Jones has not addressed any of the elements necessary for a claim based on § 446.070.  He merely argues that because Alexander violated § 67.710, he is entitled to damages.  [Record No. 45, p. 31]

Section 67.710 is part of a broader statutory scheme establishing the structure of county governments in Kentucky.  Nothing about § 67.710 indicates that the legislature intended for the statute to protect litigants like Jones.  Moreover, the statute does not indicate that it was intended to protect anyone at all.  When the legislature drafted §

67.710(7), it was not likely contemplating its effect on political patronage dismissals. Because Jones has not shown § 67.710 was intended to protect individuals like him, Alexander is entitled to summary judgment on this claim as a matter of law.

### 5.    Violation of the Kentucky Constitution

In Count II, the plaintiff claims that Alexander's decision to terminate his employment was "arbitrary and capricious, and in violation of Sections 2 and 3 of the Kentucky Constitution." [Record No. 1-1, p. 7]  Section 2 of the Kentucky Constitution states, "[a]bsolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." Ky. Const. § 2.  Section 2 is intended to curb the exercise of arbitrary authority by the government and "is broad enough to embrace the traditional concepts of both due process of law and equal protection of the law." *Bd. of Educ. v. Jayne*, 812 S.W.2d 129, 131 (Ky. 1991).  The Sixth Circuit has determined that the United States Constitution and section 2 of the Kentucky Constitution should generally be construed together. *Sheffield v. City of Fort Thomas, Ky.*, 620 F.3d 596, 612-13 (6th Cir. 2010).  The Supreme Court of Kentucky has also recognized that federal conceptions of procedural due process are applicable to claims based on section 2 of the Kentucky Constitution.  *See Commonwealth Natural Res. & Envtl. Prot. Cabinet v. Kentec Coal Co.*, 177 S.W.3d 718, 735 (Ky. 2005) (The test for procedural due process from *Mathews v. Eldridge*, 424 U.S. 319 (1976), applies to procedural due process claims raised under section 2 of the Kentucky Constitution.).

As discussed above, Alexander did not violate the plaintiff's Fourteenth Amendment due process rights by firing him because Jones did not possess a protected

property interest in his employment with PCFC.  For a protected property interest to arise under the United States Constitution or the Kentucky Constitution, "a government employee must have a legitimate claim of entitlement to continued employment, as opposed to a mere subjective expectancy."  *Romero v. Admin. Office of the Courts*, 157 S.W.3d 638, 641 (Ky. 2005) (internal quotation marks omitted).  The plaintiff has not produced any legal authority showing that the Kentucky Constitution entitles him to due process rights beyond those afforded by the federal constitution.  Because Jones is not entitled to relief under the Fourteenth Amendment, he is also not entitled to relief based on section 2 of the Kentucky Constitution.

Jones also asserts that Alexander violated section 3 of the Kentucky Constitution. "Section 3 of the Kentucky Constitution establishes the right to equal protection." *Holder v. Robbins,* No. Civ.A. 05-328-JBC, 2006 WL 751238, at *7 (E.D. Ky. Mar. 21, 2006).  *See D.F. v. Codell*, 127 S.W.3d 571, 575 (Ky. 2003) ("Citizens of Kentucky are entitled to equal protection of the law under the 14th Amendment of the United States Constitution and Sections 1, 2, and 3 of the Kentucky Constitution.").  The plaintiff has failed to explain how Alexander's decision to terminate him violated his right to equal protection under the Kentucky Constitution.  Jones does not even mention section 3 in his response to the motion for summary judgment, nor does he address the concept of equal protection.  The defendants are correct that Jones has not shown that he was treated unequally.  [Record No. 40-1, p. 23]  Thus, Alexander is also entitled to summary judgment regarding Count II.

### 6.    Wrongful Discharge Claim

Kentucky's wrongful discharge tort is an exception to the common law doctrine that "an employer may discharge his at-will employee for good cause, no cause, or for a cause that some might view as morally indefensible." *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 420 (Ky. 2010). The exception only applies where the employee's termination is "contrary to a fundamental and well-defined public policy" as evidenced by a constitutional or statutory provision. *Id.* at 420-21. "[W]hether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact." *Id.* at 421. Absent an explicit legislative statement prohibiting the employee's termination, wrongful discharge is still an available cause of action "when the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Id.* at 422.

For this claim, Jones again relies on the First Amendment's free speech and freedom of association protections. [Record No. 45, p. 31] Jones argues that federal employment law disfavors political patronage dismissals and that Kentucky generally follows federal employment law. *Id.* However, Jones fails to cite to any authority linking Kentucky employment law to federal employment law.

In fact, Kentucky courts have not yet determined whether the First Amendment's free speech protections constitute well-defined public policy for the purpose of wrongful discharge claims against government entities. *See Francis v. Marshall*, 2010 WL 4053572, at *7 (Whether political patronage dismissals violate state public policy is a question that "Kentucky courts have apparently not yet authoritatively interpreted . . . ."). In *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985), the Supreme Court of Kentucky

determined that, "[t]he First and Fourteenth Amendments do not, per se, provide a cause of action against employers for wrongful discharge."   However, the court based that holding, at least in part, on the fact that the defendant was a private employer, and "[t]he First Amendment guarantee of freedom of association only proscribes governmental transgressions." *Id.*

In *Baker v. Campbell County Board of Education*, 180 S.W.3d 479, 483 (Ky. Ct. App. 2005), the Kentucky Court of Appeals cited *Grzyb*'s First Amendment holding favorably where the defendant was a governmental entity.   According to the *Baker* court, "[t]he Kentucky Supreme Court has already rejected a claim of wrongful discharge based on the First Amendment to the United States Constitution and its counterpart, Section 1 of the Kentucky Constitution." *Id.* (citing *Grzyb*, 700 S.W.2d at 402).   Nevertheless, like *Grzyb*, *Baker* is also distinguishable from the facts of this case.   *Baker* did not involve a political patronage dismissal.   Instead, Baker based his wrongful discharge claim on a retaliatory failure to hire theory.   The court rejected the claim because "Baker has not pointed to any authority from this Commonwealth showing that any public policy involving retaliatory failure to hire exists, much less exists in a 'well-defined' state, as required by *Grzyb*." *Id.* at 484.   Similarly, Jones has not shown that the prohibition against political patronage dismissals constitutes a well-defined public policy in Kentucky.   Nor has he identified a "well-established legislative enactment" creating a right that Jones was fired for exercising.

In his response to the defendants' motion for summary judgment, Jones merely states, "It is a surprise to no one that a Kentucky county government employee

cannot be fired for his political beliefs and associations.  The state statutes are full of such prohibitions, whether aimed at the top of state government or all the way down to local boards of education."  [Record No. 45, p. 32]  Again, Jones fails to cite to any legal authority to support this contention.

Even though the Court views the facts in a light most favorable to Jones, Jones has not provided the Court with a sufficient legal basis to defeat Alexander's motion for summary judgment.  The Court agrees with Alexander that "there is no proof of record that would demonstrate that discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law; and . . . the policy is evidenced by a constitutional or statutory provision."  [Record No. 40-1, p. 24]  Accordingly, the Court need not address whether Alexander is entitled to qualified immunity because summary judgment is appropriate on the merits of Jones' claim.

## IV.

### A.    Motion for an Evidentiary Hearing

The plaintiff has also requested an evidentiary hearing "to the extent the Court believes it will be of assistance to it in ruling on the motion for summary judgment." [Record No. 49-1, p. 1]  In Jones' motion for leave to file a sur-reply, he observes that credibility of witnesses is an issue in this case.  [Record No. 50-1, p. 8]  For that reason, he suggests that a hearing would allow the Court to flesh out the facts prior to ruling on the motion for summary judgment.  *Id.* at 9.

Not only is a hearing unnecessary, it would also be inappropriate under these circumstances.  Like in this case, the parties in *Willetts v. Ford Motor Co.*, 583 F.2d 852,

855 (6th Cir. 1978), filed conflicting evidence in the record.  In reviewing the district court's summary judgment decision, the Sixth Circuit determined that the lower court's decision to hold an evidentiary hearing on the matter was inappropriate.  *Id.*  As the Sixth Circuit explained, "[a] court may not resolve disputed issues of fact in ruling on a summary judgment motion." *Id.*

To the extent that the parties have presented genuine disputes of material fact, this Court declines to enter summary judgment.  However, with respect to claims where the record demonstrates the absence of genuine issues of material fact, this Court has granted the defendants' request for summary judgment.  No further argument or testimony on the subject is necessary.  Accordingly, the plaintiff's motion for an evidentiary hearing will be denied.

### B.    Motion to File a Sur-Reply

The plaintiff also seeks permission to file a sur-reply.  [Record No. 50]  "Although the Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)).  Jones does not allege that the defendants offered new submissions or arguments in their reply brief.  Instead, he offers his sur-reply to correct "several misstatements in the Reply filed by the Defendants." [Record No. 50-1, p. 1]  However, the desire to correct statements made in a reply does not warrant a sur-reply.

Further, the alleged misstatements that Jones seeks to correct with his sur-reply involve issues that are largely immaterial to the Court's summary judgment decision.  For instance, Jones argues that he alone replaced Fugate, PCFC's former janitor.  *Id.*  Jones fails to explain and this Court is unable to discern how this issue advances any of Jones' claims.

Additionally, Jones disagrees with the defendants' statement that Kay Raichel was not Jones' supervisor.  *Id.* at 3-4.  According to Jones, Raichel's position matters because Perry County's policies and procedures require that an employee's supervisor recommend dismissal before termination based on a disciplinary issue.  *Id.* at 4.  Nevertheless, as discussed above, none of the parties to this action contend that Jones was fired based on a disciplinary infraction.

The parties also debate whether two employees continued to pick up the mail together after Jones was fired.  [Record Nos. 50-1, p. 5; 52, p. 3]  In Jones' estimation, if two people still went to pick up the mail together, Alexander was not truly concerned with duplication of services when he fired Jones.  [Record No. 50-1, p. 5]  However, the Court has determined, based on a variety of other facts offered by the parties, that a genuine dispute exists regarding Jones' First Amendment claim.  The Court's decision is not at all contingent on the outcome of this particular disagreement regarding who picks up the mail at PCFC.

The parties have also engaged in an extensive disagreement regarding hearsay statements that Jones relies on for his First Amendment argument.  According to Jones, Bubby Combs told Jones and Harkins that Alexander once said that he intended to fire

Noble's nephew as soon as he took office.  [Record No. 50-1, p. 6]  The Court declines to engage in a detailed analysis of this statement because Jones has already presented sufficient proof to avoid summary judgment on his First Amendment claim.  In short, the statement is hearsay embedded within hearsay, and Jones has only explained how one, but not both, layers of hearsay are admissible under the Federal Rules of Evidence.  *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

Jones also attempts to re-argue the issue of at-will versus for-cause employment. [Record No. 50-1, p. 2]  He again reiterates the elements for a common law wrongful discharge claim.  *Id.*  The Court agrees with the defendants that this issue has already been fully briefed by the parties, and additional argument is unnecessary.

**V.**

For the foregoing reasons, it is hereby

**ORDERED** as follows:

1.    The defendants' motion for summary judgment [Record No. 40] is **GRANTED**, in part, and **DENIED**, in part, as explained more fully above.

2.    All claims against Defendant Perry County Fiscal Court are **DISMISSED**, with prejudice.

3.    Plaintiff Jones' motion for an evidentiary hearing [Record No. 49] is **DENIED**.

4.    Plaintiff Jones' motion for leave to file a sur-reply [Record No. 50] is **DENIED**.

This 11th day of May, 2016.



Signed By:

*Danny C. Reeves*

United States District Judge